

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE: | ) |
| | ) |
| AB&C Group, Inc. | ) Case No. 08-482 |
| | ) |
| Debtor. | ) Chapter 7 |

## MEMORANDUM OPINION

Before having an involuntary Chapter 7 bankruptcy petition filed against it, AB&C Group, Inc. (the Debtor"), caused its secured lender, Sovereign Bank, to deposit $309,226 in its account for the purpose of paying the wages of its employees. The Debtor's Chapter 7 trustee asserts that the money is property of the Debtor's bankruptcy estate. The Debtor and Sovereign Bank request that the money be immediately paid to the Debtor's employees as they had originally intended.

For the reasons stated herein, the court finds that the money is property of the Debtor's bankruptcy estate and may be used by the Trustee in the administration of the Debtor's estate. Before addressing the merits of the parties' arguments, however, and for the benefit of the non-lawyer parties that have expressed an interest in this issue, a brief overview of the bankruptcy process is helpful to understand the impact of the court's decision.

When a Chapter 7 bankruptcy case is filed, all legal and equitable interests of the bankrupt debtor in property becomes property of the debtor's bankruptcy estate. 11 U.S.C. § 541(a)(1). A Chapter 7 trustee is appointed, and is charged with the task of collecting and reducing to money the property of the debtor "as expeditiously as is compatible with the best interests of the parties in interest." § 704(a)(1). In fulfilling the trustee's duties, the trustee may elect to hire professionals to investigate the assets and liabilities of the debtor, and the trustee is given special powers under the Bankruptcy Code to bring certain legal actions against parties that have dealt with the debtor in an effort to maximize the assets of the bankruptcy estate. §§ 327, 544, 547, 548.

1

In the main, the Bankruptcy Code aims to secure equal distribution among the debtor's creditors. *Howard Delivery Service, Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 655 (2006). Not all creditors, however, are treated equally. Congress created certain classes of priority creditors that are entitled to be paid, in full, before lower ranking priority creditors are paid, and all priority claims must be fully satisfied before the general unsecured creditors of a debtor receive any distribution from the bankruptcy estate. Most bankruptcy cases do not generate sufficient funds to pay all creditors in full, and many bankruptcy cases do not generate sufficient funds to pay priority creditors in full.

In general, the first creditors to be paid out of assets of the debtor's bankruptcy estate are those lenders who have taken a security interest in collateral that the trustee has sold. After the satisfaction of liens secured by the value of property sold by the trustee, unsecured creditors of the bankruptcy estate are paid in order of priority. The first group of unsecured claimants to be paid are those owed domestic support obligations. 11 U.S.C. §§ 507(a)(1); 726(a)(1). A corporate debtor, like the Debtor in this case, will not owe any domestic support obligations, but it may be obligated to make those payments on behalf of its former employees.[1]

The second group of claimants to be paid are those who are owed administrative expenses. § 507(a)(2). Administrative expense claimants are those who render services to the bankruptcy estate, or who incur expenses preserving the estate. In this case, the fees and costs of the Debtor's Chapter 7 trustee, and of any professionals he hires, will likely constitute administrative claims entitled to second priority status. These administrative claims must be fully paid before any other unsecured, priority creditor can receive payment.

Third in order of priority are creditors whose claims against the debtor arose after the filing of an involuntary bankruptcy petition, but before the appointment of the Chapter 7 trustee. § 507(a)(3). In this case, an involuntary petition was filed against the Debtor on April 4, 2008, and

---

[1] The Bureau of Child Support and Enforcement has filed a motion for the payment of domestic support obligations. (Document No. 73). According to the motion, the Bureau received 16 dishonored checks written by the Debtor on behalf of those employees that owe domestic support obligations. The Trustee has objected to the motion, and its resolution is still pending before the court.

2

the Chapter 7 trustee was appointed on April 24, 2008.[2] It remains unclear whether any creditor exists in this case that is entitled to priority treatment under § 507(a)(3).

Fourth, and of primary importance in this case, "allowed unsecured claims . . . to the extent of $10,950 for . . . wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual" must be paid from assets of the estate. Apparently, no employee of the Debtor in this case is owed more than $10,950. In the ordinary course of the administration of the Debtor's bankruptcy case, all employee wage claims must be fully paid before any other lower priority creditor is entitled to receive a penny.

With this understanding of the larger bankruptcy process, four different tensions are affected by the court's decision in this case. The first concerns the timing of payment to the Debtor's employees. If the Debtor and Sovereign Bank are successful, the employees would receive payment of their wage claims quickly. If the Trustee is successful, however, payment would not be made to the employees until such time as the Trustee is assured that enough funds exist in the bankruptcy estate to fully pay higher ranking priority creditors. Depending on how quickly the Trustee can identify and liquidate unencumbered assets of the bankruptcy estate, the delay in the payment of the employees' wages could be lengthy.

The second tension in the case concerns whether, after investigation and the hiring of professionals, the Trustee will be able to liquidate any property for the benefit of the bankruptcy estate's creditors. The Trustee may spend a substantial amount of money investigating the Debtor, and its transaction with third parties, only to find that nothing exists to liquidate. In such an event, the $309,226 currently available to pay employee wage claims may be substantially reduced (or even eliminated) by the estate's administrative expenses, resulting in the employees receiving less than the full amount of their wage claims.

Third, and cynically, one could postulate that the Debtor may benefit from depriving the Trustee of the financial resources necessary to launch a thorough, independent investigation into its

---

[2] Claims entitled to third priority under § 507(a) are those that arose after the filing of the involuntary petition but before the earlier of the appointment of a trustee or the entry of the order for relief that commences the bankruptcy case. Here, the Trustee was appointed before the court granted the involuntary petition on May 1, 2008.

3

financial affairs.[3]

The fourth tension concerns the interests of lower ranking priority creditors and the general unsecured creditors of the Debtor's bankruptcy estate. If the Debtor and Sovereign Bank are successful, and if the Trustee is deprived of funds to launch an investigation into the Debtor's financial affairs, these lower ranking unsecured creditors may not receive any return on their claims. On the other hand, these creditors have nothing to lose and everything to gain should the Trustee have adequate resources to investigate the financial affairs of the Debtor.

Therefore, like most issues in bankruptcy court, there are no clear-cut equities; there are only competing interests. With this understanding of the impact of the court's decision in this matter, the court turns to a review of the relevant history of this case, and the merits of the parties' arguments.

## I. BACKGROUND

The Debtor is a subsidiary of Blue Sky Brands, Inc. ("Blue Sky"). When it was in operation, the Debtor provided catalogue order management for various companies. It maintained facilities in Martinsburg and Ranson, West Virginia, and in Orange, Virginia. On March 21, 2006, the Debtor, along with Blue Sky and certain other related entities,[4] executed a Revolving Credit and Term Loan Agreement with Sovereign Bank. Pursuant to that Agreement, Sovereign Bank purports to have a lien on substantially all of the Debtor's assets.

According to the Debtor, it defaulted on the March 21, 2006 Agreement, and it was a party to a February 4, 2008 Forbearance Agreement with Sovereign Bank that terminated on March 15, 2008. When Sovereign Bank, Blue Sky, the Debtor, and related entities were unable to work out a more permanent loan agreement, Sovereign Bank terminated its funding and swept the Debtor's bank accounts. As a result, the Debtor did not have sufficient funds to pay its employees their wages.

On March 27, 2008, the Debtor and related entities executed a Letter Agreement with Sovereign Bank concerning the winding down of its business and the liquidation of its assets (the "Letter Agreement"). The purpose of the Letter Agreement was to allow Sovereign Bank to conduct

---

[3] The Trustee stated to the court that he was unable to locate any other readily available assets that he could use to pay for a thorough investigation of the Debtor's financial affairs.

[4] The related entities are Bits and Pieces, Inc., The Paragon Gifts, Inc., The Paragon Gifts Holdings, Inc., National Wildlife Direct, Inc., and Winterthur Direct, Inc.

4

a secured party liquidation of the Debtor and related entities, so that Sovereign Bank could collect the proceeds. Not all the anticipated liquidation proceeds were immediately payable to Sovereign Bank. The Letter Agreement allows Blue Sky, the Debtor, and related entities, access to 25% of the first $1.4 million in proceeds, and greater percentage amounts for additional proceeds received, for the purpose of paying certain "Scheduled Liabilities," as defined in the Letter Agreement. The Scheduled Liabilities included the $309,226 owed by the Debtor to its employees.

In anticipation of the receipt of liquidation proceeds, Sovereign Bank agreed to immediately advance the $309,226 to the Debtor so that it could timely pay its employees. The $309,226 was designated as the "Advance" under the Letter Agreement, and the money was sent by Sovereign Bank to the Debtor's bank account. The portions of the Letter Agreement relevant to the issues before the court are as follows:

> This letter is intended to set forth the terms on which Sovereign Bank (the "Bank") has reached agreement with the Borrowers[5] concerning a wind down of the Borrowers' businesses and the liquidation of the Borrowers' assets for the benefit of the creditors of the Borrowers, in the order of priority dictated by applicable law.
>
> The context of his agreement is that the Bank has notified the Borrowers that they are in default of their obligations to the Bank, and has ceased making loans and advances to the Borrowers under their revolving credit facilities with the Bank (the "Credit Facilities"). The Borrowers have ceased operations and have terminated the employment of their employees. Numerous liabilities incurred by the Borrowers have not been paid, the Borrowers have requested that the Bank make funds available to pay certain of these liabilities as listed on Schedule A to this agreement (the "Scheduled Liabilities"), and the Bank, subject to the provisions hereof, is willing to make funds available to effectuate the payment of them.
>
> Accordingly, the Bank and the Borrowers agree as follows:
>
> \*\*\*\*
>
> 4. The Borrowers and the Bank intend that the Bank shall conduct the Liquidation [of the Borrowers' assets] in the exercise of its rights as a secured creditor of the Borrowers (the "Secured Party Liquidation"), and the Bank shall

---

[5] The term "Borrowers" is defined in the Letter Agreement to include: Bits and Pieces, Inc., The Paragon Gifts, Inc., The Paragon Gifts Holdings, Inc., National Wildlife Direct, Inc., and Winterthur Direct, Inc.

receive all proceeds thereof (the "SP Proceeds"). The Borrowers and the Bank understand that the Bank may be prohibited or stayed from conducting a Secured Party Liquidation, in whole or in part, and the Liquidation may be conducted, in whole or in part by a third party, such as a Trustee in Bankruptcy . . . .

5.      The Borrower requests, and the Bank agrees, that from the gross proceeds actually received by the Bank for a Secured Party Liquidation . . . the Bank shall make available to or for the account of the Borrowers to pay the Scheduled Liabilities, a total amount equal to the lesser of: (A) the difference of (i) the sum of (a) twenty-five percent (25%) of the first $1,400,000 of Realized Proceeds . . . ( . . . hereinafter referred to as the "Carve Out").

6.      In anticipation of the receipt of Realized Proceeds, the Bank will immediately make to or for the account of the Borrowers an advance pursuant to the Credit Facilities up to the amount of $345,000 (the "Advance") so that the first seven items on Schedule A may be paid immediately. The Bank shall be entitled to recover the Advance from the Carve Out before any other funds from the Carve Out are paid to or for the account of the Borrowers to pay Scheduled Liabilities.

7.      The Bank shall pay the Advance and the Carve Out to or for the benefit of the Borrowers by issuing a check or checks payable to the Borrowers . . . or to such parties as the Borrowers may direct . . . all such directions to be in writing by the Borrowers submitted to the Bank . . . .

****

12.     This Agreement is executed and delivered in the Commonwealth of Massachusetts and it is the desire and intention of the parties that it be in all respects interpreted according to the laws of the Commonwealth of Massachusetts.

(Letter Agreement).

## II. DISCUSSION

The Debtor and Sovereign Bank assert three theories as to why the $309,226 deposited in the Debtor's account by Sovereign Bank should be payable directly to the Debtor's employees instead of becoming general funds of the Debtor's bankruptcy estate. They argue that: (A) Sovereign Bank advanced the money to the Debtor in trust for the benefit of the Debtor's employees; (B) the funds were "earmarked" for the payment of the Debtor's employees and the Debtor was a mere conduit for that payment; and (C) the money constitutes the collateral of Sovereign Bank, and it has the right to dictate who gets paid when it chooses to "carve out" a portion of its security interest for the benefit

of a particular class of creditors.

The Trustee denies the existence of any trust relationship, or any other type of arrangement that would prohibit his use of the funds to pay for the costs of administering the Debtor's bankruptcy estate.[6]

### A. Property Held in Trust

The Debtor and Sovereign Bank contend that the Debtor was a mere conduit for the transfer of funds from Sovereign Bank that were intended to enable the Debtor to meet its payroll obligations. As the putative trustee of the funds intended for its employees, the Debtor asserts that it only has bare legal title to the money with the equitable interest belonging to its employees. In the Debtor's view, all the bankruptcy estate obtained is its legal title, and, as the legal title holder, the estate's only duty is to give the funds to the Debtor's employees.

As defined by statute, property of a debtor's bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). In general, to the extent that a limitation exists on a debtor's right to hold and use property for its own benefit, that limitation also exists when the property is transferred to a debtor's bankruptcy estate. This limitation is codified in the Bankruptcy Code:

> (d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

§ 541(d).

A Chapter 7 trustee cannot administer an equitable interest in property that the debtor does not own. *E.g., In re Bardell*, 361 B.R. 468, 472 (Bankr. N.D.W. Va.) ("[T]he only duty of a party holding bare legal title without any equitable interest is to convey that legal title to the equitable

---

[6] The Trustee also asserts that te Debtor and Sovereign Bank lack standing to bring the motion before the court. As the putative trustee of funds held for the benefit of its employees, however, the court finds that the Debtor has standing to seek a declaration as to how the funds should be disbursed. Likewise, Sovereign Bank has standing to the extent that it argues that it is the putative settlor of the alleged trust, and to the extent that it asserts that the Trustee seeks to commandeer the proceeds of its secured collateral.

7

interest holder."); *aff'd*, 374 B.R. 588 (N.D.W. Va. 2007).

Pursuant to the Letter Agreement, the parties expressly contracted that it be interpreted according to Massachusetts law. Accordingly, to the extent that the parties intended the Letter Agreement to create a trust for the benefit of the Debtor's employees, the court must look to the laws of Massachusetts.

The term "trust" is defined as "a fiduciary relationship with respect to property, arising from a manifestation of intention to create that relationship and subjecting the person who holds title to the property to duties to deal with it for the benefit of . . . one or more persons, at least one of whom is not the sole trustee." *Restatement (Third) Trusts* § 2 (2003). Although the word "trust" is not mentioned in the Letter Agreement, a trust "can be created without using the word 'trust' if the language of the [document] indicates such an intention." *Smith v. Livermore*, 10 N.E.2d 117, 124 (Mass. 1937). Under the view of the Second and Third Restatements, no requirement exists that a beneficiary have notice of, or accept the trust. *Restatement (Second) Trusts* § 36 (1959); *Restatement (Third) Trusts* § 14 (2003). In the case "of a formal declaration of trust with its terms expressly set out in a clear and unambiguous manner," Massachusetts follows the Restatements and likewise does not require notice or acceptance by the trust beneficiary. *Mikshis v. Palionis*, 187 N.E.2d 147, 148 (Mass. 1963). On the other hand, when the trust is an informal, voluntary trust, then Massachusetts " 'requires notice to the [beneficiary] or to some person in his behalf, and at least implied acceptance by the [beneficiary], in order to perfect the creation of the trust.' " *Id.* (citation omitted). Notice to the beneficiary is necessary because "the law is skeptical of the reality of a trust so declared" when the owner of personal property puts the apparent title to that property in his or her own name as trustee for another, when in fact the putative trustee is "without any intent to create a genuine present interest in that other . . . ."[7] *Regan v. Phillips*, 187 N.E.2d 801, 802 (Mass. 1963).

---

[7] Debtor's counsel argues that West Virginia law – not Massachusetts law -- should apply to the transaction. Although West Virginia does not specifically require that the trustee or settlor give notice to the beneficiary of a voluntary, informal trust, West Virginia does require that there be a "'manifestation of intention to create a trust'" in personal property. *State ex rel. Ins. Comm'r v. Blue Cross & Blue Shield of W. Va.*, 638 S.E.2d 144, 152 (W. Va. 2006) (citation omitted). Evidence of that manifestation "'may be written or spoken or by conduct.'" *Id.* Even if West Virginia law did apply, the court's conclusion that no trust relationship was created by the Letter Agreement, or independently created by the Debtor, would remain unchanged.

8

In this case, the Letter Agreement is an attempt to allow Sovereign Bank to engage in the liquidation of the Debtor's assets – and the assets of related entities – to satisfy its secured claim.[8] The opening paragraph of the Letter Agreement reflects that intention, and it also states that the liquidation is for the benefit of the Debtor's creditors, who are to be satisfied "in the order of priority dictated by applicable law." The second paragraph of the Letter Agreement notes that the Debtor has ceased its business operations, terminated its employees, and that it has incurred numerous unpaid liabilities. Sovereign Bank then states is willingness "to make funds available to effectuate the payment" of those unpaid liabilities, which are specifically listed on Schedule A. That list of obligations includes the Debtor's payroll obligations.

Thus, the Letter Agreement leaves little doubt that Sovereign Bank expressly made funds available to the Debtor for the purpose of having the Debtor pay the existing wage claims of its employees. The mere fact that the money was intended to be paid to the Debtor's employees, however, does not mean that the Letter Agreement establishes a trust that gives the Debtor's employees a present, equitable interest in the funds advanced to the Debtor. To create a trust, there must either be "an express declaration of trust" or "'circumstances indicating an intention of the depositor to place the fund irrevocably beyond his control and to devote it to the indicated purpose.'" *Mid-Atlantic Supply, Inc. v. Three Rivers Aluminum Co.*, 790 F.2d 1121, 1126 (4th Cir. 1988) (citation omitted).

The Letter Agreement does not contain any express declaration of trust. Also, no indication exists in the Letter Agreement that the Debtor was to hold the money advanced by Sovereign Bank in a fiduciary capacity. The context of the Letter Agreement is not Sovereign Bank's desire to benefit the Debtor's employees; rather, the stated context of the Letter Agreement was that the Debtor had defaulted on its obligations to Sovereign Bank, and the Letter Agreement's purpose was to effect a winding down of the Debtor's business so that its assets could be liquidated. All creditors – not just the Debtor's employees – were intended to benefit from the liquidation of the Debtor's assets, and were to be paid "in the order of priority dictated by applicable law." If applicable law is the Bankruptcy Code (and bankruptcy was expressly contemplated as an eventuality in the Letter

---

[8] Accompanying the Letter Agreement was another document "Consent to and Waiver of Notice of Secured Party Private Sales."

9

Agreement), the administrative fees are to be paid before wage claims. The Letter Agreement also expressly states that the money transferred to the Debtor to enable it to meet its payroll obligations was made "for the benefit of the [Debtor]" – not for the benefit of the Debtor's employees. The court simply cannot find any viable manifestation of intent on behalf of Sovereign Bank to create a fiduciary relationship between the Debtor and its employees based on the language of the Letter Agreement.

Although the Debtor now declares that the funds were held in trust for its employees, no written or spoken manifestation of that intent previously existed, nor is there any assertion by the Debtor that it gave notice to its employees of the alleged, informal, voluntary declaration of trust. Although the Debtor was subject to lawsuits by its employees at the time the Letter Agreement was executed, and although the Debtor did write the checks to its employees, the circumstances existing at the time of the execution of the Letter agreement, and the Debtor's subsequent conduct, only demonstrates the intended use to which the Debtor was going to put the money. While it is plain that the Debtor intended its employees to benefit from their Letter Agreement, the circumstances of this case are insufficient to establish that the Debtor created a trust relationship, with accompanying fiduciary duties, between the advanced money and its employees.

Moreover, as detailed by the Trustee, a portion of the $309,226 deposited in the Debtor's account by Sovereign Bank was used by the Debtor for purposes other than paying its employees. On April 24, 2008 – apparently out of concern that there was not enough money in the account to honor all of its payroll checks – an additional $2,500 was deposited into the Debtor's account, meaning that all deposits totaled $311,726. When the funds in the Debtor's bank account were turned over to the Trustee pending resolution of this matter, however, he only received $303,153. No accounting is before the court explaining the use to which the Debtor put the missing $8,573.

In sum, the Letter Agreement fails to create an express trust, and fails to manifest an intention by Sovereign Bank to create a fiduciary relationship between the Debtor and its employees with respect to the $309,226. Regarding the Debtor, it never executed a separate, written declaration of trust with respect to the funds in its account, and the circumstances of this case, viewed in light of the Debtor's actions with respect to the $309,226, fail to create an informal, voluntary trust. While the Letter Agreement is most likely a contract to transfer property for the benefit of the Debtor's

10

employees as third parties to the contract, such a contract does not create a trust-type relationship. *E.g., Restatement (Third) Trust* § 5 (2003) ("The following are not trusts: . . . (i) contracts to convey or certain contracts for the benefit of third parties . . . .").

## B. Earmarking

The Debtor argues that the Trustee cannot use the $309,226 sent by Sovereign Bank to the Debtor's bank account on the grounds that the money was "earmarked" for the payment of the Debtor's payroll obligation.

To adequately explain why the earmarking doctrine is not applicable to this case, a brief explanation of the development of this judge-made doctrine is necessary.

A trustee in bankruptcy has certain powers to recapture payments made by a debtor to the debtor's creditors within the 90-day period preceding the date of the debtor's bankruptcy petition. 11 U.S.C. § 547. The purpose of recapturing these payments is to avoid preferential treatment by the debtor among the debtor's pre-petition creditors. *Union Bank v. Wolas*, 502 U.S. 151, 160-61 (1991). To be successful on a § 547 preference action, the trustee must demonstrate, among other things, that the property transferred belonged to the debtor in the first instance. 11 U.S.C § 547(b).

The "earmarking" doctrine is a creditor's defense to a trustee's preference action and "is entirely a court-made interpretation of the statutory requirement that a voidable preference must involve a 'transfer of an interest of the debtor in property.'" *In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 565 (8th Cir. 1988). In essence, the earmarking doctrine involves three parties: "[w]hen new funds are provided by the new creditor for the benefit of the debtor for the purpose of paying the obligation owed to the old creditor, the funds are said to be 'earmarked' . . . ." *Id.* The "inequities" sought to be remedied by the earmarking doctrine are two fold. The doctrine prevents a guarantor of the debtor from having to pay an obligation twice, and it prevents the debtor's bankruptcy estate from receiving a windfall:

> The earliest enunciation of the doctrine occurred in cases where the new creditor providing new funds to pay off the old creditor, was himself also obligated to pay that prior debt. . . . Where such a guarantor paid the debtor's obligation directly to the old creditor, the courts rejected the claim that such payment was a voidable preference. The holding rested on a finding that the new creditor's payment to the old creditor did not constitute a transfer of the debtor's property. The courts buttressed this conclusion with the rationale that no diminution of the debtor's estate had occurred since the new funds and new debt were equal to the preexisting debt and the amount available for

11

> general creditors thus remained the same as it was before the payment was made. A possible additional rationale may have been the view that such a result was needed to avoid unfairness and inequity to the new creditor. If his direct payment to the old creditor was voided, and the money was ordered placed in the bankruptcy estate, the new creditor, as guarantor, would have to pay a second time.
>
> Where the guarantor, instead of paying the old creditor directly, entrusted the new funds to the debtor with instructions to use them to pay the debtor's obligation to the old creditor, the courts quite logically reached the same result.
>
> ****
>
> The courts have extended the doctrine beyond the guarantor situations and have applied it to situations where the new creditor is not a guarantor but merely loans funds to the debtor for the purpose of enabling the debtor to pay the old creditor. The same rationales have been used to justify the results where the doctrine has been so extended, i.e., that the debtor held the new money "in trust", that the debtor did not have "control" of the new money and that the transaction did not diminish the debtor's estate. Earmarking has been held to exist where the new lender himself directly pays the old creditor, and even in cases where the new lender entrusts the funds to the debtor with instructions to use them to pay the old creditor.

*Bohlen Enterprises, Ltd*, 859 F.2d at 565-66.

Three generally accepted requirements must exist before the earmarking defense to a preference action may be successful: "(1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt; (2) performance of that agreement according to its terms; (3) the transaction viewed as a whole . . . does not result in any diminution of the estate." *Id.* at 566; *see also Sheehan v. Valley Nat'l Bank (In re Shreves)*, 272 B.R. 614, 624 (Bankr. N.D.W. Va. 2001) (adopting the *Bohlen Enterprises* requirements); *Hovis v. Powers Constr. Co. (In re Hoffman Assocs.)*, 194 B.R. 943, 958-59 (Bankr. D.S.C. 1995) (same); *Wasserman v. Village Assocs.*, 153 B.R. 972, 982 (Bankr. D. Md. 1993) (same).

In this case, the Trustee is not seeking to recover a preference payment; rather, the Trustee is asserting his right to use funds that were in the Debtor's bank account when the involuntary petition against it was filed. Thus, the Debtor is asking the court to apply a judge-made doctrine intended to avoid perceived inequities in preference litigation to a different context – the Debtor seeks to use the earmarking doctrine in an effort to determine what constitutes property of the

bankruptcy estate under 11 U.S.C. § 541(a). The court, however, declines to extend the application of the earmarking doctrine to § 541(a) because § 541(a) already clearly defines what is, and what is not, property of a debtor's bankruptcy estate. In short, "[i]f a debtor receives funds from a new creditor to pay its existing debt, the debtor's interest in the funds must be analyzed under § 541, including any limitations thereunder, as for example, those set forth in § 541(b) and (d), and the limitation on § 541(a)(1) related to traceable property that the debtor holds in trust for another." *Manchester v. First Bank & Trust Co. (In re Moses)*, 256 B.R. 641, 648 (B.A.P. 10th Cir. 2000); *see also Parks v. Georges Motor Co. (In re Johnson)*, No. 04-5239, 2006 Bankr. LEXIS 690 at *13 (Bankr. D. Kan. April 24, 2006) (refusing to apply the earmarking doctrine outside of its intended purpose as a preference defense).

Accordingly, the court will not apply the "earmarking" doctrine outside of its intended application as a preference defense, and will analyze whether the $309,226 at issue in this case is property of the estate within the confines of 11 U.S.C. § 541(a).

**C. Carve Out Agreement**

The Debtor and Sovereign Bank assert that the $309,226 deposited in the Debtor's bank account constitutes part of Sovereign Bank's secured collateral. Thus, they argue, because the money belongs to Sovereign Bank, it can use the money to pay whomever it wishes.

Several courts, including this one, have approved carve out agreements that allow secured creditors to pay over a portion of their collateral to such other entities as the secured party directs. *E.g., Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating, LLC)*, 478 F.3d 452 (2d Cir. 2007); *In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir. 1993); *In re Tackley Mill, LLC*, 386 B.R. 611 (Bankr. N.D.W. Va. 2008). A review of those cases, however, reveals important distinctions between the types of carve out agreements approved in those cases and the "Carve Out" that is defined by the Letter Agreement.

In the case of *In re SPM Mfg. Corp.*, 984 F.2d at 1307, a case involving conversion from a Chapter 11 proceeding to a Chapter 7 proceeding, the secured lender had a $9 million lien on all the assets of the debtor. Under a post-petition agreement with the debtor's unsecured creditor's committee, the secured lender agreed to share a portion of the proceeds of any liquidated collateral with the unsecured creditors in return for gaining their cooperation in the bankruptcy proceeding.

13

*Id.* at 1308. The eventual liquidation of the debtor's estate only realized $5 million in proceeds, and, honoring its agreement, the secured lender paid a portion of that amount to the unsecured creditor's committee. *Id.* at 1312. The effect of the agreement was to upset the priority distribution scheme of the Bankruptcy Code by paying unsecured creditors ahead of priority unsecured creditors. *Id.* at 1312-13. The court held, however, that no party other than the secured lender had any claim to the $5 million in liquidation proceeds. *Id.* at 1312. Moreover, the Bankruptcy Code only governed distributions from the estate -- "creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including share them with other creditors." *Id.* at 1313. Thus, the court approved the transaction and thereby held that the funds distributed by the secured lender were never property of the debtor's bankruptcy estate.

In the case of *Iridium Operating, LLC*, 478 F.3d at 456, a Chapter 11 case, the debtor's unsecured creditor's committee decided to compromise their causes of action against the debtor's secured lender, and use funds realized from that compromise to pursue a cause of action against the debtor's parent company. An administrative claim holder (who also happened to be the debtor's parent company) objected to the settlement on several grounds, including that the settlement paid money to the general unsecured creditors without paying priority creditors in full. *Id.* The settlement, however, was presented to the court under Fed. R. Bankr. P. 9019. *Id.* at 464. In evaluating a Rule 9019 settlement agreement, the bankruptcy court must, among other things, evaluate whether the settlement is fair, reasonable, and in the best interest of the bankruptcy estate. *Id.* at 465. When making this determination, a bankruptcy court can "endorse a settlement that does not comply in some minor respects with the priority rule if the parties to the settlement justify, and the reviewing court clearly articulates the reasons for approving, a settlement that deviates from the priority rule." *Id.* at 464-65. Much like *Iridium Operating, LLC*, this court in the case of *Tackley Mills, LLC*, 386 B.R. 611, while it was still a Chapter 11 proceeding, approved a settlement under Rule 9019 that allocated a portion of the secured creditor's collateral to the unsecured creditors' committee as the quid pro quo for terminating litigation. At the time the settlement agreement was presented to the court for approval, no party was contending that it violated the Bankruptcy Code's priority treatment rules.

In the view of Sovereign Bank and the Debtor, the Letter Agreement creates a similar type

14

scenario to that detailed in *SPM Mfg. Corp.*, *Iridium Operating LLC*, and/or *Tackley Mills, LLC*. The court disagrees. *Iridium Operating LLC*, and *Tackley Mills LLC*, are plainly distinguishable from this case inasmuch both concerned court scrutiny and approval of settlement agreements presented under Rule 9019. In this case, there is no indication that the Letter Agreement constituted a settlement agreement, and even if it did, the agreement was never presented to the court for approval. The standards of Rule 9019 are simply not applicable here.

More importantly, however, the $309,226 deposited in the Debtor's bank account was not a distribution by Sovereign Bank of its secured collateral to the employees of the Debtor, and, therefore, it is unlike *SPM Mfg. Corp.* No indication exists that Sovereign Bank was contractually obligated to make the payment to the employees, or that it was making a gift of its secured collateral. Paying the employees was an obligation of the Debtor – not of Sovereign Bank.

In fact, the money intended to pay the wages of employees was an "advance" for the benefit of the Debtor, and the funds were payable to the Debtor and not its employees. The "advance" was made pursuant to the parties' pre-existing Credit Facilities; thus, it appears that the $309,226 was a loan to the Debtor that had to be repaid. In fact, Sovereign Bank preserved for itself the right to recover the "advance" from the "carve out" before any other funds from the "carve out" could be disbursed to pay the Debtor's Scheduled Liabilities. (Letter Agreement ¶ 6). Its claim that the $309,226 constitutes a carve out of the type recognized in bankruptcy is both contrary to the terms of the Letter Agreement and common usage.

### III. CONCLUSION

The abrupt cessation of Debtor's business has caused a hardship for its creditors, including its former employees, and generated turmoil in the communities in which it operated. Unfortunately, this is not an uncommon occurrence. Business distress and failure, as well as business success and longevity, are dual features of our economic experience. They have been a part of our country's historical landscape since the beginning of the Republic. In instances of failure, as in this case, bankruptcy – as imperfect as it might be – is the legal field upon which creditors clash for primacy over the assets of a liquidating debtor. It is the process whereby order is brought to what would otherwise be an unruly and haphazard dissolution. Unfortunately, a bankruptcy case is not without its economic casualties. Moreover, the resolution of disputes during the administration of a case can

appear at times to be both perplexing and frustrating. While the court can do little to alleviate the harsh effects of a business bankruptcy, it can seek to illuminate its decisions with clarity and empathy. This opinion embodies that effort. In that regard, if the court were free to simply fashion whatever remedy it so desired, the wages would be paid. But for the reasons the court has outlined, that is not the case. Instead, the court is honor bound to apply the law as best as it can. In this instance, the facts and the pertinent law show that the Trustee's argument has greater merit. Thus, for the reasons set forth herein, the court will sustain his objection to the Debtor's motion.

The court will enter a separate order pursuant to Fed. R. Bankr. P. 9021 that denies the Debtor's motion to authorize payment of pre-petition wages and related taxes.